******************************************************

The "officially released" date that appears near the beginning of an opinion is the date the opinion will be published in the Connecticut Law Journal or the date it is released as a slip opinion. The operative date for the beginning of all time periods for the filing of postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying an opinion that appear in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced or distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# IN RE ZAKARI W.*
## (AC 48030)

Moll, Clark and Wilson, Js.

*Syllabus*

The respondent mother appealed from the judgment of the trial court terminating her parental rights with respect to her minor child. The mother claimed that the court erred in concluding that she failed to achieve a sufficient degree of personal rehabilitation within the meaning of the statute (§ 17a-112 (j) (3) (B)). *Held*:

The trial court properly concluded that the respondent mother failed to achieve a sufficient degree of rehabilitation such that, within a reasonable time and considering the age and needs of the minor child, she could assume a responsible position in his life, as the evidence adduced at trial, including evidence of the mother's repeated, ongoing failure to comply with her specific steps and her refusal to cooperate with the Department of Children and Families, was sufficient to support the court's finding by clear and convincing evidence as required by § 17a-112 (j) (3) (B).

Argued March 19—officially released June 6, 2025**

*Procedural History*

Petition by the Commissioner of Children and Families to terminate the respondents' parental rights with respect to their minor child, brought to the Superior Court in the judicial district of New Haven, Juvenile Matters, where the case was tried to the court, *Conway, J.*; judgment terminating the respondents' parental

---

* In accordance with the spirit and intent of General Statutes § 46b-142 (b) and Practice Book § 79a-12, the names of the parties involved in this appeal are not disclosed. The records and papers of this case shall be open for inspection only to persons having a proper interest therein and upon order of the court.

Moreover, in accordance with federal law; see 18 U.S.C. § 2265 (d) (3) (2018), as amended by the Violence Against Women Act Reauthorization Act of 2022, Pub. L. No. 117-103, § 106, 136 Stat. 49, 851; we decline to identify any person protected or sought to be protected under a protection order, protective order, or a restraining order that was issued or applied for, or others through whom that person's identity may be ascertained.

** June 6, 2025, the date that this decision was released as a slip opinion, is the operative date for all substantive and procedural purposes.

rights, from which the respondent mother appealed to this court. *Affirmed.*

*Matthew C. Eagan*, assigned counsel, for the appellant (respondent mother).

*Emily Barigye*, assistant attorney general, with whom, on the brief, were *William Tong*, attorney general, and *Nisa Khan*, assistant attorney general, for the appellee (petitioner).

*Opinion*

CLARK, J. The respondent mother, Tali B., appeals from the judgment of the trial court rendered in favor of the petitioner, the Commissioner of Children and Families, terminating her parental rights as to her minor child, Zakari W. (Zakari).[1] The respondent claims that the court erred in concluding that she failed to achieve a sufficient degree of personal rehabilitation within the meaning of General Statutes § 17a-112 (j) (3) (B). We disagree and, accordingly, affirm the judgment of the trial court.

The following facts, as found by the trial court or as are undisputed in the record, and procedural history, are relevant to our resolution of this appeal. Zakari was born in December, 2022, to the respondent and Zion W. (Zion). Zakari was born premature at thirty-three weeks and, as a result, needed assistance with breathing and feeding. Zakari spent twenty-four days hospitalized following his birth before being discharged.

The Department of Children and Families (department) first became involved with the family on the day of Zakari's birth after receiving a referral from staff at the hospital where he was born, which reported that

---

[1] The parental rights of Zakari's father, Zion W., were also terminated in the proceeding underlying this appeal, but he is not a party to this appeal. Accordingly, we refer to Zakari's mother as the respondent and to Zakari's father by his first name.

the respondent and Zion lacked stable and appropriate housing. Within one day of Zakari's birth, Kristine Florio, an investigative social worker for the department, attempted to meet with the respondent and Zion at the hospital. The respondent told Florio that she was not in a position to speak with her because she first needed to speak with Zion, who was asleep in the hospital room. Over the next few weeks, Florio had difficulty maintaining communication with the respondent; she had one brief telephone conversation with the respondent and communicated with her via text message approximately two or three times per week, but was unable to arrange an in-person meeting despite repeated attempts. In the telephone and text message communications, the respondent acknowledged that she lacked appropriate housing and indicated that she would like Zakari placed with a friend of her family upon discharge from the hospital. On or about December 27, 2022, Florio attempted to contact the respondent to discuss a plan for Zakari's discharge from the hospital but received no response.

Upon Zakari's discharge from the hospital, the petitioner filed a neglect petition and obtained an ex parte order of temporary custody that same day, and Zakari was placed in fictive kin[2] foster care with a friend of the respondent's godmother. On January 6, 2023, the respondent and Zion failed to appear at the hearing on the preliminary order of temporary custody, and the court, *Conway, J.*, sustained the order of temporary custody. The respondent and Zion also failed to appear at the plea hearing on the neglect petition on February 14, 2023, and the court, *Conway, J.*, entered a default

---

[2] General Statutes § 17a-114 (a) (3) provides that " 'fictive kin caregiver' means a person who is twenty-one years of age or older and who is unrelated to a child by birth, adoption or marriage but who has an emotionally significant relationship with such child or such child's family amounting to a familial relationship."

judgment and committed Zakari to the custody of the petitioner. On the same day, the court ordered specific steps to facilitate reunification, which required the respondent, inter alia, to keep all appointments set by the department and cooperate with all home visits, to let the department know where she resided and inform the department of any changes to her contact information, to participate in counseling, to submit to a substance abuse evaluation and follow any recommended treatment, to obtain and maintain adequate housing and a legal income, to visit Zakari as often as permitted, and to cooperate with service providers recommended by the department.

Kelly Thibault, a social worker for the department, took over the respondent's case on or about January 27, 2023. The trial court found that "Thibault attempted to meet with [the respondent] to assess [her] needs and to offer reunification services. Although . . . Thibault had text communications with [the respondent], [the respondent] did not make [herself] available for an in-person meeting with . . . Thibault until the end of March, 2023. Throughout all of 2023, and possibly into January, 2024, [the respondent] lived a transient life and . . . would not or could not keep the department up to date about where and with whom [she was] living. . . . Thibault's request to visit [the respondent] at [her] various temporary residences were denied; at times [the respondent] . . . reported [that her] hosts objected to department contact or involvement. . . . Thibault, not wanting to potentially jeopardize [the respondent's] fleeting housing by alienating [her] host, respected the [respondent's] wishes and representations and did not pursue gaining access to [her] residences, given that none of the homes were being proffered as potential homes for reunification purposes. Throughout 2023 and into January, 2024, [the respondent], often belatedly, provided the department with [her] city [or] town of

residence but [was] not forthcoming with a specific address.

"Retrospectively, at the termination trial, the [respondent and Zion] chronicled their 2022 through 2023 living situation in their trial testimony. While pregnant [with Zakari] in 2022, the respondent . . . and [Zion] resided with [Zion's father and his family] . . . in Waterbury. At some point, in late 2022 but before Zakari's . . . birth, [the respondent and Zion] left [that] residence and moved in with [Zion's mother] in New Haven. [The respondent and Zion] left that home in February, 2023, because of [their] ongoing arguments with [Zion's] mother. The [respondent and Zion] next resided for two weeks with [Zion's grandmother] in Ansonia before moving in March, 2023, to [the home of the respondent's mother] in Bridgeport. The [respondent and Zion] left that home in May, 2023, due to arguments . . . with [the respondent's mother]. In May, 2023, [the respondent and Zion] lived with [the respondent's] grandmother in Bridgeport for two weeks [until June, 2023, when they moved back in with Zion's mother] in New Haven. [The respondent and Zion] moved out of [that] home in New Haven in September, 2023, due to ongoing arguments with [Zion's mother]. In October, 2023, [the respondent and Zion] went to stay with [Zion's] cousin in Ansonia. From October to December, 2023, [or] January, 2024 . . . Thibault credibly testified [that] she believed the [respondent and Zion] were living back and forth between Ansonia and Waterbury. [The respondent and Zion] testified that, in very early December, 2023, they moved [back in with Zion's father and his family in Waterbury] . . . .

"[T]he predominant means of communication between . . . Thibault and [the respondent] throughout 2023 was via text messaging. . . . Thibault credibly testified that there were periods of time when [the

respondent] did not maintain even texting communication. [The respondent] credibly testified that in 2023 there were 'gaps' of time when [she and Zion] did not have operable cell phones and/or cell phone service. Reliable cell phone operability was most recently an issue for [the respondent] in April, 2024. At the time of the termination [of parental rights] trial, [the respondent] testified that she [had] just obtained a new cell phone and [that it was operable], and [that] she [was] in frequent contact with . . . Thibault. . . .

"In early 2023 . . . Thibault sought to refer [the respondent] for a substance abuse evaluation/assessment and . . . to submit to a mental health assessment. At the time, [the respondent was] residing in Bridgeport and therefore a referral was made for [her] to attend South West Behavioral Health Systems. The respondent . . . scheduled an intake . . . but [did not follow] through. . . .

"Thibault learned in May, 2023, [that] the [respondent was] residing in New Haven and she therefore referred [the respondent] to New Haven based State Street Counseling [(State Street)] and [Midwestern Connecticut Council of Alcoholism, Inc. (MCCA)]. State Street . . . offers treatment for dually diagnosed clients and therefore if [the respondent] had attended she could have been assessed for substance use/abuse and undergone a mental health assessment. [The respondent] did not engage with either State Street . . . or MCCA. . . . Thibault persevered in attempting to engage the [respondent] and she attempted to connect [the respondent] with Prosperity Counseling, an entity that offers mental health evaluation/assessment and treatment but also case management services, to assist in getting [the respondent] to engage with services and providers. [The respondent] failed to follow through with Prosperity Counseling.

"When . . . Thibault learned of [the respondent's] relocation to Ansonia, she discussed with [her] engaging with Behavioral Health Care. Once again, [the respondent] did not appear for the intake appointment. In January, 2024, the [respondent] informed . . . Thibault of [her] relocation [back] to the . . . Waterbury residence [of Zion's father]. . . . Thibault identified Waterbury based Wellmore Counseling Services [(Wellmore)] as an appropriate referral for [the respondent] and . . . informed [the respondent] about Wellmore's walk-in hours. It [was not] until mid-April, 2024, two days prior to the start of the . . . trial, that [the respondent] went to Wellmore . . . . Wellmore recommended [that the respondent] be assessed by Wheeler Clinic, [which] also offers walk-in hours. By the conclusion of the . . . trial on May 1, 2024, [the respondent] had yet to engage with Wheeler Clinic.

"The department attempted to assist [the respondent] with housing. [The respondent was] encouraged to call 211 and, as far back as March, 2023 . . . Thibault assisted [the respondent] in completing a referral for supportive housing services. . . . Thibault repeatedly tried to explain to and discuss with [the respondent] what [she] needed to do for supportive housing eligibility purposes and for reunification purposes. [The respondent] would respond that [she] would do what [she] needed to do but then not do it or become angry and abruptly end the discussion.

"[The respondent was] offered weekly supervised visitation with Zakari. Throughout 2023, [the respondent] reported a lack of reliable transportation. In March, 2023, [the respondent and Zion] resided in Bridgeport. . . . Thibault transported . . . Zakari to the [respondent's] Bridgeport residence [which was in the apartment building of the respondent's grandmother]. At the [respondent's] direction, apparently because the department was not welcome to come inside the apartment,

the supervised visit took place in the building's lobby. Subsequently, the department was successful in having Quality Parenting Center (QPC), a supervised visitation and parenting coaching/education provider . . . transport Zakari to visits in Bridgeport. However, once [the respondent] relocated to an undisclosed New Haven address . . . QPC deemed [the respondent] no longer eligible for QPC transport [due to the proximity of New Haven to QPC's location in Hamden and the availability of public transportation between the respondent's home and QPC's Hamden location]. From June [through] August, 2023, the respondent . . . attended five out of twelve scheduled visits . . . . [She was] unsuccessfully discharged from QPC on August 18, 2023, [due to inconsistency in attending visitation appointments]. . . . Supervised parent-child visits were then moved to the [department's] New Haven . . . office; [the respondent] attended approximately half of the scheduled visits [at that office].

"In the latter part of 2023 . . . Thibault understood the [respondent] to be living back and forth between Ansonia and Waterbury. In January, 2024 . . . Thibault referred [the respondent] to 'r Kids, an agency that provides professional supervised visitation services and parenting coaching/education services. [The respondent] failed to attend the January 22, 2024 'r Kids intake appointment. Nonetheless, from February 2, 2024, to April 16, 2024, (the first day of the termination [of parental rights] trial), there had been ten scheduled 'r Kids supervised visits. [The respondent] attended seven supervised 'r Kids visits . . . missed one visit due to [the respondent] oversleeping . . . missed [another visit] because [the respondent] did not confirm ahead of time [her] intent to attend, and . . . missed [a third visit due to a miscommunication between the respondent and the department's central transportation unit . . . driver].

"The department attempted to assist the respondent with transportation [for the supervised visits]. Throughout the case the [respondent was] offered bus passes. When public bus transportation was not feasible, the department was amenable to purchasing train tickets for [the respondent but was unable to do so because the respondent was] not forthcoming about [her] location and/or [was] too transient to know from what train station [she was] traveling to and from. . . . [From] early 2024 [through the time of trial] . . . the [respondent was] provided with department based . . . transportation to and from 'r Kids." (Citation omitted; footnotes omitted.)

On January 3, 2024, the petitioner filed a petition to terminate the respondent's parental rights, alleging that the department had made reasonable efforts to reunify the respondent with Zakari and that the respondent had failed to achieve a sufficient degree of personal rehabilitation pursuant to § 17a-112 (j).[3] The court, *Conway, J.*, held a trial on April 16 and May 1, 2024. On the first day of trial, the respondent testified that she expected to reside at the home of Zion's father in Waterbury (Waterbury residence) long-term and that she had

_____

[3] General Statutes § 17a-112 (j) provides in relevant part: "The Superior Court, upon notice and hearing as provided in sections 45a-716 and 45a-717, may grant a petition filed pursuant to this section if it finds by clear and convincing evidence that (1) the Department of Children and Families has made reasonable efforts to locate the parent and to reunify the child with the parent in accordance with subsection (a) of section 17a-111b . . . (2) termination is in the best interest of the child, and (3) . . . (B) the child (i) has been found by the Superior Court or the Probate Court to have been neglected, abused or uncared for in a prior proceeding . . . and the parent of such child has been provided specific steps to take to facilitate the return of the child to the parent pursuant to section 46b-129 and has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child . . . ."

a bed, clothes, and toys ready for Zakari at that home. On April 23, 2024, however, when Thibault attempted to meet with the respondent at the Waterbury residence, the respondent refused to let her inside the house.

On May 17, 2024, the court issued a memorandum of decision granting the petition. The court found by clear and convincing evidence that the department had made reasonable efforts to reunify the respondent with Zakari, that the respondent failed to achieve a sufficient degree of personal rehabilitation to encourage the belief that within a reasonable time she could assume a responsible position in Zakari's life, and that terminating the respondent's parental rights was in Zakari's best interest.

On appeal, the respondent claims that the court erred in concluding that she failed to achieve a sufficient degree of personal rehabilitation.[4] The respondent argues that because her "rehabilitation was dependent on housing, and because whether the respondent's housing was suitable for [Zakari] was easily determined within a short period of time, the trial court erred in determining [that] the evidence was sufficient to terminate [her] parental rights . . . ." The petitioner argues to the contrary that the respondent faced "many obstacles to reunification with Zakari [that] spanned beyond housing and remained unaddressed at the time of trial," and that the court properly considered all of the relevant factors in determining that the respondent had failed to rehabilitate. We agree with the petitioner.

The following legal principles and standard of review govern the respondent's claim. "In the adjudicatory

[4] Pursuant to Practice Book §§ 67-13 and 79a-6 (c), the attorney for the minor child filed a statement adopting the brief of the petitioner and supporting the affirmance of the judgment terminating the respondent's parental rights.

phase of a termination of parental rights proceeding,[5] the court must determine whether one of the . . . statutory grounds that may serve as a basis for termination of parental rights exists. . . . Failure of a parent to achieve sufficient personal rehabilitation is one of [the] statutory grounds on which a court may terminate parental rights pursuant to § 17a-112. . . . That ground exists when a parent of a child whom the court has found to be neglected fails to achieve such a degree of rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, the parent could assume a responsible position in the life of that child." (Footnote added; internal quotation marks omitted.) *In re Aurora H.*, 222 Conn. App. 307, 317–18, 304 A.3d 875, cert. denied, 348 Conn. 931, 306 A.3d 1 (2023).

"Personal rehabilitation as used in [§ 17a-112] refers to the restoration of a parent to [her] former constructive and useful role as a parent. . . . [I]n assessing rehabilitation, the critical issue is not whether the parent has improved [her] ability to manage [her] own life, but rather whether [she] has gained the ability to care for the particular needs of the child at issue. . . . An inquiry regarding personal rehabilitation requires us to obtain a historical perspective of the respondent's child-caring and parenting abilities. . . . Although the standard is not full rehabilitation, the parent must show more than any rehabilitation. . . . Successful completion of the petitioner's expressly articulated expectations is not sufficient to defeat the petitioner's claim

---

[5] "A hearing on a petition to terminate parental rights consists of two phases, adjudication and disposition. . . . If the trial court determines that a statutory ground for termination exists, it proceeds to the dispositional phase. In the dispositional phase, the trial court determines whether termination is in the best interest of the child." (Internal quotation marks omitted.) *In re Timothy B.*, 219 Conn. App. 823, 835, 296 A.3d 342, cert. denied, 349 Conn. 919, 318 A.3d 439 (2023).

that the parent has not achieved sufficient rehabilita-
tion. . . . [E]ven if a parent has made successful
strides in her ability to manage her life and may have
achieved a level of stability within her limitations, such
improvements, although commendable, are not disposi-
tive on the issue of whether, within a reasonable period
of time, she could assume a responsible position in
the life of her children." (Citations omitted; internal
quotation marks omitted.) *In re Zarirai S.*, 229 Conn.
App. 239, 254–55, 326 A.3d 1148 (2024).

"A conclusion of failure to rehabilitate is drawn from
*both* the trial court's factual findings and from its
weighing of the facts in assessing whether those find-
ings satisfy the failure to rehabilitate ground set forth in
§ 17a-112 (j) (3) (B). Accordingly . . . the appropriate
standard of review is one of evidentiary sufficiency,
that is, whether the trial court could have reasonably
concluded, upon the facts established and the reason-
able inferences drawn therefrom, that the cumulative
effect of the evidence was sufficient to justify its [ulti-
mate conclusion]. . . . When applying this standard,
we construe the evidence in a manner most favorable
to sustaining the judgment of the trial court." (Emphasis
in original; internal quotation marks omitted.) *In re
Shane M.*, 318 Conn. 569, 587–88, 122 A.3d 1247 (2015).[6]

In the present case, our careful review of the record
leads us to conclude that the court's determination that

---

[6] "Prior to *In re Shane M.*, supra, 318 Conn. 569, courts had applied the
clear error standard of review both to a trial court's determination that a
parent failed to rehabilitate and to that court's subordinate factual findings."
*In re Kyreese L.*, 220 Conn. App. 705, 720 n.8, 299 A.3d 296, cert. denied,
348 Conn. 901, 300 A.3d 1166 (2023). In her principal appellate brief, the
respondent argues that "the standard of review as established by our
Supreme Court in *In re Shane M.*, should be replaced by the former clear
error standard." As the respondent acknowledges, however, this court "is
bound by the precedent from our Supreme Court and is unable to modify
it." *In re Denzel W.*, 225 Conn. App. 354, 380 n.14, 315 A.3d 346, cert. denied,
349 Conn. 918, 317 A.3d 1 (2024).

the respondent failed to achieve a sufficient degree of rehabilitation is well supported by the evidence. The respondent's specific steps required her to obtain adequate housing, to keep the department informed about where and with whom she resided, and to "cooperate with home visits, announced or unannounced . . . ." As the court found, the respondent was transient from the time of Zakari's birth in December, 2022, until December, 2023, or January, 2024, around the time of the filing of the petition. Thibault testified that for most of that time the respondent refused to provide her with the address of her residence or the names of people with whom she resided but, instead, would only tell her in which town she was living and that she was staying with "family or friends." Although the respondent testified that she moved to the Waterbury residence in early December, 2023, Thibault testified that the respondent did not inform the department of the move or provide the address until the end of January, 2024.

In addition, despite the respondent offering the Waterbury residence as a permanent home for Zakari, there was evidence in the record that called into question the permanency of that arrangement. As the court noted in its memorandum of decision, the respondent and Zion previously moved out of the Waterbury residence shortly before Zakari's birth, and the respondent did not provide a plausible explanation why they were welcome to reside there permanently at the time of trial but not at the time of Zakari's birth. Moreover, Thibault testified that, as of the first day of trial, the respondent still had not allowed her inside the residence to assess whether it was a suitable home. As the court found, although "the [respondent] testified that [she] understood the need to permit the department access to any residence proffered as a suitable home for Zakari," Thibault was "denied access to the [Waterbury residence]

by the respondent . . . allegedly because [Zion's father] was not comfortable with the department coming into his home. On April 23, [2024, approximately one week after the first day of trial] . . . Thibault went back to [the Waterbury residence] with releases to be signed by the [respondent]," but "[the respondent] refused . . . Thibault access to the home, notwithstanding that the termination trial was scheduled to resume to conclusion on May 1."

The respondent's specific steps also required her to "visit [Zakari] as often as permitted," but the evidence indicates that the respondent repeatedly missed scheduled visits. A social study submitted by Thibault in support of the termination petition, which was admitted into evidence, indicates that the respondent attended only six of seventeen weekly visits that were scheduled at the department's New Haven office. Thibault testified that, when the department referred the respondent to QPC for visitation and parent coaching, she was unsuccessfully discharged after attending only five of twelve scheduled visits. Thibault further testified that, when the department referred the respondent to 'r Kids for visitation services after she moved to the Waterbury residence, she failed to attend the intake appointment and then missed three of ten scheduled visits. As Thibault testified, the department took various steps to address the respondent's transportation issues, including transporting Zakari to Bridgeport so that the respondent could visit with him close to home, arranging to provide the respondent with bus passes and train tickets, and providing transportation to and from visits via the department's centralized transportation unit. Despite these efforts, the respondent continued to miss scheduled visits with Zakari throughout the pendency of the case.

Thibault further testified that the respondent's lack of cooperation with the department and failure to

engage in recommended services prevented the department from fully assessing the respondent's needs. Thibault testified that the respondent had reported feeling depressed and was concerned about possible postpartum depression. The respondent's specific steps required her to "[t]ake part in counseling and make progress toward the identified treatment goals" and indicated that those goals were "[to be determined] upon further assessment." In addition, the specific steps required the respondent to "[s]ubmit to a substance abuse evaluation and follow the recommendations about treatment . . . ." Thibault testified that between March, 2023, and January, 2024, she referred the respondent to several different service providers depending on where the respondent was living at the time, but the respondent repeatedly failed to attend her intake appointments. During her testimony, the respondent acknowledged that she did not engage with any of the recommended service providers until four days before the first day of trial when she went for an initial assessment at Wellmore, which referred her to Wheeler Clinic. Although Wheeler Clinic offers walk-in hours, the respondent acknowledged that she had not followed up on that referral as of the conclusion of the trial.

The respondent's specific steps also required her to "[k]eep all appointments set by [the department] . . . ." Thibault testified, however, that the respondent attended only one of three scheduled administrative case reviews, which are held to discuss the progress of the case and explain the department's expectations with respect to the reunification plan. Thibault further testified that when she attempted to discuss with the respondent the importance of engaging with recommended services, the respondent would resist those efforts by either stating that she did not need the services or abruptly ending the conversation. The social

study submitted by Thibault in support of the termination petition indicates that, as of December 18, 2023, the respondent "ha[d] not met with [Thibault] since [May 5, 2023] to discuss the case despite numerous requests made by the [d]epartment."

We disagree with the respondent's contention that the court could not conclude that she failed to rehabilitate merely because she claimed to have obtained permanent housing by the time of trial. First, the court was not required to credit the respondent's testimony concerning the suitability or permanency of her residence at the time of trial. On the contrary, given the respondent's long history and pattern of transience throughout the period of the department's involvement in the case and the respondent's continuing refusal to grant the department access to her residence at the time of the trial, there was more than sufficient evidence for the court to conclude that the respondent had not obtained and likely would not remain in a permanent and suitable housing environment.[7]

Second, the respondent's argument also ignores the fact that the court's determination that she failed to

_____

[7] In her principal appellate brief, the respondent appears to argue that the court erred in failing to grant a continuance so that the department could conduct an inspection of the Waterbury residence. Specifically, the respondent argues in her brief that the court was "required [to grant] additional time to determine whether the respondent's residence was appropriate for reunification," and that "[t]he failure to allow for such minimal delay acted against the statutory language [of § 17a-112 (j) (3) (B)] and resulted in an improper termination of the respondent's parental rights." During oral argument before this court, however, the respondent's counsel clarified that the respondent was not claiming that the court erred in failing to grant a continuance but, instead, was arguing that the court was required to consider whether the respondent would have been able to demonstrate sufficient rehabilitation if given additional time for the department to inspect her residence. The record reflects that the court expressly considered—and rejected—the respondent's argument that the circumstances justified giving her additional time to rehabilitate, however, and we conclude that the court's determination that the respondent failed to rehabilitate was reasonably supported by the evidence.

rehabilitate relied on more than just her lack of permanent housing. Rather, the memorandum of decision indicates that the court relied on the totality of the evidence regarding the respondent's overall failure to address the issues that led to Zakari's commitment to the petitioner's custody, finding that "[the respondent] repeatedly eschewed the department's attempts to connect [her] with services and providers that were essential for reunification." The court further found that "[t]he evidence and testimony does not support giving [the respondent] additional time to become compliant with the court-ordered specific steps and/or to afford [the respondent] further time to decide whether to more fully collaborate with the department." In light of the aforementioned evidence of the respondent's repeated, ongoing failure to comply with her specific steps and refusal to cooperate with the department, the court's determination in that regard was well supported by the record. Accordingly, we conclude that the evidence was sufficient to support the conclusion that the respondent failed to achieve a sufficient degree of rehabilitation such that, within a reasonable time and considering the age and needs of Zakari, she could assume a responsible position in his life.

The judgment is affirmed.

In this opinion the other judges concurred.